The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Lorrie L. Dollar. The appealing party has shown good ground to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
* * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act and the employer-employee relationship existed at all relevant times.
2. The recorded statement taken by claims adjuster Gaye Cline was stipulated into the record.
3. The defendant is a duly qualified self-insured with Constitution State Services as the servicing agent on the risk.
4. The plaintiff's average weekly wage as of December 9, 1992 was $252.00.
5. Three pages listing plaintiff's wages for the period beginning January 10, 1993 through July 31, 1993 are accurate.
* * * * * * * * * * *
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
FINDINGS OF FACT
1. On July 14, 1992 the plaintiff was a 32-year-old female who was hired as a cuff and seam operator. The plaintiff was placed in a training program. In the training program the production standard was 80 dozen cuffs per day.
2. On August 14, 1992 the plaintiff experienced sharp pain and numbness in her left hand and swelling in her hand and both ankles. The plaintiff sought medical attention from Laura McHargue, who was the plant nurse.
3. The plaintiff complained to Nurse McHargue of left hand pain, swelling in her hand and both ankles, shortness of breath and dizziness. The plaintiff requested a blood pressure check and advised the nurse that she had run out of her blood pressure medication. Nurse McHargue found the plaintiff to have extremely high blood pressure at that time, and she told the plaintiff that she could not return to work without a note from her doctor. Plaintiff returned to work a few days later with still no treatment for her pain.
4. In October of 1992 the plaintiff experienced a hot, tingling sensation in her left arm, and believed it to be like the symptoms of a heart attack. The plaintiff went to Dr. Shelli Cannon on October 27, 1992, who indicated plaintiff's problem with her left hand was not related to her blood pressure, but rather was likely carpal tunnel syndrome.
5. The plaintiff reported this to Nurse McHargue and was referred to Dr. Stephen Naso of Carolina Hand Center on November 9, 1992. Dr. Naso ordered testing and diagnosed the plaintiff as having carpal tunnel syndrome. He initially indicated that the job entailed quite a bit of repetitive motion, and that plaintiff began to experience symptoms very quickly after she started the job.
6. As the result of plaintiff's condition, she was unable to work for defendant-employer in any position from December 9, 1992 through January 25, 1993. Plaintiff return to work for the defendant-employer earning diminished wages for the period ending January 30, 1993 through July 31, 1993, when she ceased to work for defendant-employer. Plaintiff's average weekly wage at the time of the onset of the occupational disease was $252.00. Her average weekly wage after January 30, 1993 was $95.63.
7. Dr. Naso has opined that plaintiff's obesity and fluid build-up had contributed to her development of carpal tunnel syndrome. In consideration of these factors, Dr. Naso opined that the job was less likely to have caused plaintiff's carpal tunnel syndrome. He further opined and informed the plaintiff that her carpal tunnel syndrome was most likely to have been present well before her work with defendant. However, the Full Commission gives greater weight to the opinion of Dr. Shelli Cannon and Dr. Branch.
8. Dr. Cannon testified that the repetitive movements which were described in the cuff and seam operation were the cause of her carpal tunnel syndrome and placed her at greater risk of contracting this disease. Dr. Cannon also indicated that it was possible for these symptoms to occur within a period of 11 to 12 days and she indicated that this was not out of the ordinary and seemed probable.
Dr. Branch also treated plaintiff. Dr. Branch indicated that "the job condition in all likelihood aggravated her condition." [Branch Dep. P. 15]. He further indicated that a job such as repetitive sewing is a high risk job for carpal tunnel syndrome and placed her at greater risk of incurring this condition than the general population. By letter dated January 17, 1994 to plaintiff's attorney, Dr. Branch further indicated, "without a doubt, her other health issues do have some contributory impact . . . in essence I guess I can say with some degree of certainty that the occupation of sewing places a patient at greater risk for the development of carpal tunnel syndrome than other occupations. I think this is generally recognized and should be apparent to the people who are seeking these kind of jobs."
In explaining the opinions regarding the fact that the condition developed so quickly, Dr. Branch stated that the plaintiff probably had borderline thickened ligaments and that is why she developed the symptomatology rather quickly. He further indicated that she had the underlying condition or had a very mild condition that was turned into a clinically significant condition by the job. Since there was already some thickening of the transverse carpal tunnel ligament, yet not enough to cause compression on the nerve, it did not take much stress on that area to make the employee symptomatic. In further questioning as to whether the job as a sewer could have contributed in a significant way to the development of the carpal tunnel condition, Dr. Branch indicated yes. In analyzing the fact of the quick development of the condition, but also relative to the fact that the employee continued to do this job over a period of approximately four months, Dr. Branch, when asked whether the job of the employee contributed in a significant way to this condition, answered, "I'm sure it contributed." In further elucidating, he stated that the scenario could have easily been that she just had some tendinitis or synovitis initially and that she continued to work and that this led to carpal tunnel syndrome and "that's certainly the probable progression." [Branch Dep. P. 29].
9. Finally, Dr. Branch indicated to a reasonable degree of medical certainty that while there was an accumulation or a collection of factors which led to the carpal tunnel, including her obesity and fluid buildup, that the performance of her job between July and December was a significant contributing factor to her development of carpal tunnel syndrome.
10. The Full Commission finds that plaintiff suffers from a five percent permanent partial impairment to her left hand.
* * * * * * * * * * *
Based upon the findings of fact, The Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. To be compensable, a disease must be characteristic of a certain trade; not an ordinary disease of life to which the public is generally equally exposed; and there must be a causal connection between the disease and the claimant's employment. N.C.G.S. § 97-53 (13).
2. Since the employment exposed plaintiff to a greater risk of contracting the disease than the general public, she is entitled to benefits. Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d, 359 (1983). The plaintiff's carpal tunnel syndrome is due to conditions and causes characteristic of and peculiar to her employment with defendant-employer. It is not an ordinary disease of life to which the general public not so exposed is equally exposed, and is, therefore, an occupational disease.
3. As a result of plaintiff's carpal tunnel syndrome, she is entitled to temporary, total disability benefits at the rate of $168.01 per week from December 9, 1992 through January 25, 1993. She is further entitled to temporary partial benefits for the period ending January 30, 1993 through July 31, 1993 based on two-thirds of the difference between her average weekly wage of $252.00 before the onset of the occupational disease and the average weekly wage thereafter of $108.55, that being $95.63 weekly or plaintiff is entitled to permanent, partial disability benefits for 10 weeks at a rate of $168.01 for the five (5) percent permanent partial disability she suffers to her left hand. However, plaintiff must select the desired award under N.C.G.S. § 97-30 or N.C.G.S. § 97-31. N.C.G.S. § 97-29, N.C.G.S. § 97-30, and N.C.G.S. § 97-31.
5. Plaintiff is entitled to have defendants provide all medical expenses and medical treatment necessary as a result of this occupational disease. N.C.G.S. § 97-25.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
AWARD
1. Since Constitution State Services was the servicing agent on the risk at the time of plaintiff's last injurious exposure, it is responsible for the benefits due in this case.
2. Defendant, Constitution State Services, shall pay temporary, total disability benefits to plaintiff at the rate of $168.01 per week from December 9, 1992 through January 25, 1993. This compensation has accrued and shall be paid to plaintiff in a lump sum subject to an attorney's fee hereinafter approved.
3. Defendant, Constitution State Services, shall pay plaintiff when she has elected either to receive permanent partial disability at the rate of $168.01 per week for 10 weeks for the five (5) percent permanent partial impairment she suffered to the right hand or temporary partial benefits as stated in paragraph 3 of the Conclusions of Law. This compensation has accrued and shall be paid to plaintiff in a lump sum subject to an attorney's fee hereinafter approved.
4. Defendant, Constitution State Services, shall pay all medical expenses incurred by plaintiff as a result of this compensable injury.
5. An attorney's fee in the amount of twenty-five (25) percent of the award is hereby approved for plaintiff's counsel. Said amount shall be deducted from the aforesaid award and paid directly to plaintiff's counsel.
6. Defendant, Constitution State Services, shall pay the costs due the Commission.
FOR THE FULL COMMISSION
 S/ _______________________ COY M. VANCE COMMISSIONER
CONCURRING:
S/ _______________________ THOMAS J. BOLCH COMMISSIONER
S/ _______________________ DIANNE C. SELLERS COMMISSIONER
CMV/cnp/mj 7/10/95